May it please the Court. With the Court's permission, I would like to begin the argument by addressing the question that the Court has put to Council in its order this past Friday, which was whether, notwithstanding the fact that this case has been characterized since shortly after it was initiated as a petition for writ of habeas corpus, whether the Court may and should consider it instead at the present time as possibly either an action for mandamus or as a civil lawsuit against the Bureau of Prisons. And from the perspective of the appellant, of the petitioner in this case, Your Honors, certainly the case was initially brought on May 2 by the petitioner or appellant pro se in the District Court in Texas as a motion under the IAD Act, under the Uniform Extradition Act, by him against the Bureau of Prisons. And it was only because he was then unrepresented, was pro se, was in custody, and this happened several days before he was actually physically transported to California, that there was no attorney who appeared before a court to argue that there should be either a temporary restraining order or a preliminary injunction. And since he was then transported to California, while he was not, while this action, the present action was pending, it was subsequently characterized as an action for habeas corpus, as a habeas corpus proceeding. What is it? Pardon? How is it properly characterized? We think it can be characterized as a motion for mandamus, because that's how it was brought initially. It was brought as a motion to prevent the Bureau of Prisons from transporting him in violation of the IAD. He got it right before the lawyers got involved. He got it right. Correct, Your Honor. You are now telling us that you agree with how this should be characterized. Well, let me say, Your Honors, we have briefed it because the Court has considered it as an action for habeas corpus. We've briefed it that way. And quite frankly, we think that notwithstanding the fact that the Court's order says that it does not challenge conditions of confinement or execution of a sentence, nonetheless, to be quite frank, we think that under the decisions of the Supreme Court and a decision of this Court, in fact, in which Judge Hawkins, you were on the panel, it could be an action for habeas corpus. In Wilson v. Bellicue, 554F3rd, H16, this Court held that under circumstances where one is challenging in a person in custody, you're challenging a future action by the Court, future confinement, it could be brought as a habeas corpus proceeding. Well, this case is not about future confinement. Well, it's confinement. Can we just cut to the chase here, at least for my benefit? Yes, sir. Let's assume that however it's characterized, your client has before the courts of the United States a claim that the provisions of the Interstate Detainer Act were violated, that he wanted a hearing which is provided for under the IAD, made a timely request for it, was not given that hearing, and instead was transferred to California State custody despite that apparent violation of the IAD. Let's assume all of that is correct. What's the relief you seek? The relief we seek is that he be returned to Beaumont, Texas, where at that point... That's the physical relief. I mean, what's the ultimate relief? Do you want the Attorney General of the United States to direct the state courts of California on how they treat his allocution to these two murders? Well, we think that's a possibility. We acknowledge that the court... What's your authority for suggesting... We have no authority that says other than the fact that... ...it would go along a lot better if you listen to my questions and respond to them. Okay? Yes, sir. I may even be trying to help you. You never know. Okay? I agree, Your Honor. Okay. So let's assume all of that's true and you're back in Beaumont, Texas. Why anybody would want to go back to Beaumont, Texas? Hey, Arlington looks good. And you... Beaumont's an entirely different neck of the woods, believe me. I just know what I say on TV. And you've got the attention of Eric Holder, the Attorney General of the United States, and you're in front of him. And he says, okay, our BOP people violated the IED. What do you want? What's your response? We want Mr. Bloomgarden not to be transported to California for a potential trial in which he could be executed. Because... And what's your authority? Let's just imagine I'm Eric Holder. Actually, our presiding judge here knows him quite well. Let's just assume I'm Eric Holder and I say, okay, what's the authority for that? The authority is that under Article 4 of the IED, the governor, which in this case is you, Attorney General Holder, can withhold the authority... For what reason? Because in this case, to permit him to be tried in California would violate a constitutional right under the United States Constitution. And do you not feel that the California courts have adequately addressed that constitutional question? Mr. Holder, we feel that the California courts have not adequately addressed that. They considered this in limine and told the State of California they couldn't use his allocution statements. On the other hand, under California law as it presently stands, unless, Attorney General Holder, you condition the transfer of Mr. Bloomgarden, he will be prevented from testifying in his own behalf. So you want me to tell the California courts how to rule? No, Attorney General. What we want you to do is we want you to enforce the Constitution. And you say the California courts have not? We say that the California courts... Is there a case anywhere that suggests the treatment that the California courts have given this issue? Wait a minute. Hang on. Is violative of the Constitution? No. You have no authority for that? We have no authority for that. So what you want me to do, there is no authority for me to do it? The authority is in the exercise of the Attorney General's discretion, which is granted by the IAD, to withhold the authority to transfer the prisoner. And, Mr. Attorney General, in the exercise of your discretion, you should realize that trying Mr. Bloomgarden under these circumstances would, even though there's no specific authority, would violate the Constitution of the United States. And, therefore, we're asking you, Mr. Attorney General, to please exercise the discretion that the IAD gives you. And you can either say that in the supplemental excerpts of record, there is substantial testimony by a very experienced trial lawyer in New York, very highly regarded, who was found to have committed ineffective assistance of counsel, but he believed that the plea in New York to a Federal charge would preclude a trial in California under the Double Jeopardy Clause. Now, it turns out that, to that extent, both a district judge in New York, who did not fully consider all the facts, and, at present, a judge in California, who will be trying this case. So you've argued that issue twice and lost it? But that does not preclude the Attorney General from saying I don't want to dominate your time. You've answered my questions. Thank you very much. This is a case, again, if I were arguing before the Attorney General, I would say to him this is a case in which the Bureau of Prisons has run roughshod over the IAD. This is a case which, Mr. Attorney General, you should consider the fact that a man has been sitting in prison in California, fearing the possibility that he may be executed since 2005, with the Bureau of Prisons having totally ignored the rights that he had under the Interstate Detainer Act. Why wouldn't that be remediable, say, in a 1983 action or a Bivens action? It might be. But it might also be a substantial factor to be considered by the Attorney General. Let me say this case has aroused interest in various parts, particularly the Jewish community, for example, who feel that various, I mean, their representatives here today in court, for that matter, who feel that there's substantial injustice and a possibility that a man will be executed. For a crime he's admitted committing? He's admitted in allocution that he's done that. He's facing jail until 2025, Your Honor. This is not a man who is totally, you know, is going to be released tomorrow onto the streets. He's got a 405-month sentence. It's not as if he's been extradited to Algeria or someplace where he's been shipped to California, where presumably he is, for all appearances, getting due process there. So are you suggesting that somehow the federal government has to protect your client from the due process that he'll get in California? The federal government should have given him the opportunity to say to the Attorney General what I have tried to say. I understand, but you've invoked all this parade of horribles to the Jewish community, and I just don't understand what that has to do with the argument. Well, it has to do, I think, with the overall... It sounds like, you know, he's being exported to a hostile country. No, he's not. Listen, Your Honor, I'm not making any suggestions. I'm not defending California per se, but to put the face on the matter, there may well be problems, and appear to be, about how the interaction between the California authorities and the Bureau of Prisons in Texas with respect to the IAD. I agree with that. The question is what kind of remedy, and to invoke it, to make it, you know, send your client back so that it can be this, what may or may not be a charade. I don't know if it's a charade or not, but it has the risk of being that. You know, the Attorney General, if there have been problems with the enforcement of the IAD, I'm not sure how one, through the judicial process, remedies that by a transfer back and forth. That's why I raised the question about damages, if there's some other remedy. Judge Fischer, let me explain it. The main focus of an attempt of discussion with the Attorney General would be to avoid the possibility of capital punishment and of execution in this case. Nobody is saying, again, that Mr. Bloomgarden, who acknowledged in his allocution that he was involved in these murders, is to go free, is not to be prosecuted. The purpose of the effort that would be made with the Attorney General would be to try to see to it that this man, whose lawyer in New York told him, look, take this plea in federal court in New York, because you will not then face execution in California because there's a double jeopardy claim. Don't worry about it. We'll include a statement in which you acknowledge that you participated in this murder, these murders in California. That was ineffective assistance of counsel in California. Has double jeopardy applied to separate sovereigns? I'm not, Your Honor, I'm not Mr. Shargell. I'm not defending his advice. No, I'm just asking you, you're involved in this case. You're passionately trying to prevent a man from being executed. My hat's off to you for doing that. But my question is simple. As a matter of law, does double jeopardy, the principles of double jeopardy, apply to separate sovereigns? The answer is no. No. The answer is no. I've learned the lesson from the earlier argument. The answer to your question, Your Honor, was no. However, in this case, the defendant, who is a layman, who is not a lawyer, was told that by one of the most experienced trial counsel who tries cases in federal courts in New York. He said, look, I think there's enough of a double jeopardy argument that the California courts won't prosecute you because you're going to get an enormous sentence in the federal court in New York. And he did get an enormous sentence. You may want to save some time for it. Thank you, Your Honor. May it please the Court, Daniel Levin on behalf of the Bureau of Prisons. I'd like to address the issue in the court's order. Before we get there, I would like to make just a point because I think it goes to, regardless of whether we're under 2241 or federal question jurisdiction or mandamus, and that's that it seems that the basis defendants claim that you'd have to succeed on under any track is to show a due process violation. And it's clear that there is no due process rights under the IED because a prisoner doesn't have a liberty interest in a transfer. And the Supreme Court has held that twice, first in a case called Meacham v. Fano from 1974, which was an intrastate transfer. But the statute, the IED statute, gives a person in Bloom Garden's circumstance the right to make a timely request to be heard before the attorney general before there's a physical transfer, correct? Let me answer it two ways. I think it implicitly anticipates some notice. It doesn't say, the way it's written, 4A, it says, the time period runs from when the sending state receives notice. And it says there will be 30 days in which the governor or attorney general can disapprove the transfer, either on his own motion, the governor's own motion, or on the defendant's motion. I think implicit in that is an idea of notice, although I don't think it expressly has an ‑‑ the only express notice provision in the IED has to do with when the detainer is initially lodged. Is it your argument that a person in Bloom Garden's circumstance has no such right? No. I think ‑‑ I think ‑‑ Then why are you arguing about it? Well, I'm ‑‑ it's not a constitutional right. That's ‑‑ Get to that. Okay. No, I agree. I want to start at first base. Sure. Does he have such a right? I would see it as implicit in that statute. It's not constitutional. Does he have a right under the IED statute to ask the attorney general for an opportunity to say, here's why I shouldn't be transferred? I believe it's implied in the statute, yes. Okay. And did he have that opportunity here? Yes. I think he ‑‑ well, I think he did. He, in fact He had that opportunity, but it was foreclosed, was it not? Oh, sorry, what you mean by the rig was when He rejected the waiver. He said, I wanted to make an argument. He said to the folks at the prison, I want to contest this. He was familiar with the procedure. He had done it in Florida before. He was effectively foreclosing the door shut in his face, was he not? Well, when they ‑‑ you mean when they withdrew the Doesn't help you a bit, counsel, to toy with the facts. I don't, no, I understand the facts. I don't mean to, I think he did not, when they withdrew the, excuse me, when they withdrew the detainer, I think at that point he was foreclosed because now they were no longer under the IED. Yes, I agree that that's true. And I think that's a feature of there being two tracks that basically the Supreme Court approved of in Morrow, a detainer track and an IED track, and both of them existing at the same time, that there is a track that's just entirely separate from the IED. Once you proceed down the detainer track, you can't unilaterally say, oh, no, I don't want to go there. I want to go to the RIP track. Morrow says you can't do that. Well, Morrow says that the RIP functions as a request if you're under a detainer, and that's how the VOP initially treated it. They send a letter on April 6th saying we're under the IED. Tell me, why did California change their mind? Why did they stop the detainer track? I don't know. I can't really answer that. I just don't know. I don't represent California. I really don't know, Your Honor. Well, they were aware that he was making some noises about that and wanted a hearing. They may have been. It's not on the record. I just don't know the answer, Your Honor. Assuming they were, that may have been the motivation. He never had an opportunity to have anybody hear his reasons for not having the transfer made. With respect, Your Honor, I actually disagree with that because he did file. He filed his petition pro se. It's constructively filed April 25th, actually reached the court on May 2nd. On May 3rd, counsel appeared. This is still within the 30-day period. Within May 3rd, counsel appeared in the Eastern District and filed a supplemental pleading. In that, in his pro se pleading, signed on April 25th, it's an executive record beginning at 33, he says that he understands that he wants to make these claims. So he does go to court with counsel within the 30-day period. He doesn't get the relief he wants. But this is not a situation where it's 30 days ran and he. That's not the same thing. The fact that he files it with somebody, it's not the same thing as getting the attorney general to consider it. No, no, it's not, Your Honor. Or the attorney general's representative when they're fighting it. So what he was deprived of. Although it does, the district. I haven't finished my. You're not done with this question. I'm sorry. Okay. So in any event, whatever was put out there, there is no evidence in this case that the attorney general or the attorney general's representative considered the request. Is there? No. Okay. So what the, to the extent we are in a mutual agreement between us, that there is at least a statutory right of the prisoner to petition to the transferring authority, the sending state or AG in this case. He did not get that. All he did was a chance to, because he found out about it, to put a piece of paper with his arguments before the prison officials. It never, for all we know, never came to, and probably never came to the attention of the attorney general or the attorney general's decision-making authority. So under those circumstances, what remedy is there and available to whom for the Bureau of Prisons and the state of California, to the extent their party to it, what remedy is there to address the failure to comply with this Act of Congress? Well, I think he can, he could seek a mandamus. Clearly, I think there's jurisdiction to do so. He could probably, we could attempt to bring an action for damages, I suppose. I suppose it would be under Bivens, although then he would run up into the problem that this is a, he would need a constitutional claim and not a statutory claim. Right. I suppose, well, he could bring a claim under the present litigation reform act for damages. Let's assume this case is before us in the posture of mandamus. Then what's the remedy? Let's assume we find that there was a violation of the statute. I don't believe under mandamus, I don't believe he's entitled to a remedy under mandamus, but I don't believe he can meet the Bowman factors. But I don't think, I don't know in this posture that there is really a remedy, or at least the remedy he wants, which is to. . . Setting aside, let me focus my question. Setting aside the notion of whether or not it's a charade or a futile act, let's assume that the attorney general presented with, now with eloquent counsel arguing his position, had that been at the outset and the Bureau of Prisons had foreclosed true consideration of that so the attorney general could make an informed discretionary judgment, what would be the remedy now to get before the attorney general that argument? Or is it now too late? The barn doors, you can't shut the barn door after the horses have left. I suppose that the remedy would be, Your Honor, that the court could order the Bureau of Prisons to. . .  to request the defendant back in order for the attorney general to make a discretionary determination about whether to approve the transfer. I mean, I suppose, I don't. . . And what's the harm in that? Why would the government, let me finish. Why would the government not even just say, Petitioner, you can stay in California. We're going to stay the California proceedings for 30 days, allow you to make your argument that you should have been allowed to make a while ago, we'll hear what the attorney general has to say, and then everybody can go on their merry way. What's the harm in that? And why isn't that an appropriate remedy? Well, staying in the California proceedings, I think that raises a question under Younger. I mean, that's an extraordinary remedy to stay a state criminal proceeding. What's the status of those criminal proceedings? Is there a trial date? They're ongoing. I don't know whether. . . There wasn't as of a few months ago as the last that I saw an update for, but they are. . . It's your position that Mr. Bloomgarden remains in federal custody. I mean, he's essentially. . . Physically, he's in California custody, obviously. He's in California Central Jail. He has constructively. . . The IAD provides this notion that the sending state retains custody, and that goes to the he's getting the time limit. So the Bureau of Prisons. . . Whether California. . . I don't know, frankly, whether California would honor a request to send him back. I mean, a Bureau of Prison request to return him. It would raise questions of comedy, I think, and I don't know the answer. I can't. . . Even if they transferred the wrong person? I understand that's a hypothetical, but even if they transferred the wrong person? Well, then. . . I mean, it's still the same, I think, question. I mean, of course they grant the request if they have the wrong person. You know, and then he'd also, of course, have a habeas remedy in California to say, you're holding me unlawfully. I'm not the person named in your indictment. I mean, he has plenty of avenues to. . . You know, if he's being wrongly held in California, he's not the person in the indictment. I didn't hear an answer to my colleague's question, and I have the same question. And you understand we don't discuss the merits of these cases before we take the bench? In case you didn't know that, I'll tell you that. I have the very same question he does, and that is, what harm would come to the Bureau of Prisons or the Department of Justice if this matter for some reason by some hook or crook were stayed for 30 days while this man has an opportunity to try to convince the Attorney General that he should not have been transferred? Well, there's not a harm to the Bureau of Prisons. We've said, I think, we've put it under the rubric of. . . To the answer to my question, none? To the Bureau of Prisons. To California, which I don't represent, I can envision there being a harm. And as I said, I think there is a significant issue with a federal court staying a state court proceeding under abstention doctrines. But putting that aside, we've said he remains free to go to the Attorney General and make this petition. And the Attorney General, I think, I mean, he could have done this all along. Nothing is stopping him. Now, if the Attorney General had said, I can't. . . I'm not permitted to consider this any longer. Well, then fine. Then maybe he needs an order from this court saying, Mr. Attorney General, you must do so. But the Attorney General might. . . If he brings it and the Attorney General says, in my discretion, this is not a transfer that I would disprove or disapprove of, then essentially he's gotten the review that he sought. Nothing is stopping him from going all this time. Nothing is stopping him from going to the Attorney General and bringing his case. Other than the folks in Texas who told him he had no right to challenge the transfer, as an example. Well, he was told that in the Bureau. . . He was told that, although it hasn't ultimately stopped him. If he stands here today, nothing. . . As far as I'm aware, he has not done so. So if we were to enter an order saying that without deciding what effect of the order would be vis-à-vis the State of California, but simply ordered the Attorney General to exercise his discretion within 30 days of the order as to whether or not the transfer should have been allowed, that is, had it been presented to him in accordance with the IAD, the Attorney General would then what? Be able to say, well, I don't have jurisdiction anymore to do that, or the Attorney General would follow the court's order and exercise his discretion? I presume if the court ordered the Attorney General to consider it, I presume the Attorney General would follow that order. The Attorney General doesn't always agree with our orders. I'm trying to find out, quite frankly. I don't know whether that's what we would do, but there's no point in . . . Well, I say no point. I don't want to prolong or create some setup here that's going to generate needless further litigation. If the Attorney General, you said the Attorney General would have to decide whether to exercise or might say, well, I don't have jurisdiction anymore. I think it is . . . there is a question of whether the 30 days is the maximum time in which the Attorney General may do it. However, that doesn't . . . that's assuming . . . if there was an error in the 30-day period, I'm not saying that then you're forever out of luck. I mean, if a defendant is . . . So if the . . . were the court to tell the Attorney General there was an error in the 30-day period, the defendant wasn't given adequate opportunity to move for a disapproval, he should be given such an opportunity. I presume that there would be such an opportunity would be given, although I have to say I don't . . . Who's your client? My client is the United States, and I say I presume that such an opportunity would be given. Your client is who? I represent the Bureau of Prisons. There's just the Federal entity in this. So you can't buy the Attorney General? No. I'm just . . . I'm not authorized to stand here today to buy the Attorney General. Well, he's your ultimate boss. That is correct, Your Honor. I would always ask before representing on behalf. We'll give you a note to take to the Attorney General that excuses you. All right. If there's nothing further, thank you, Your Honor. Thank you. Isn't all you want in this case the opportunity for your client to petition the Attorney General and get a ruling from him? Isn't that all this case is about? Nothing more. At this juncture, that's what this case is about. Yes, Your Honor. That is the immediate request that we have, although the question is whether California can proceed on that while this matter is pending and could be presented before the Attorney General. Let me say as a matter of information, although I'm not involved in the California state trial, I'm told that the state trial date is now set for April 27th of this year, which means that if, in fact, there is going to be an opportunity to make a presentation to the Attorney General, that would have to very possibly might affect that trial date in the state court. My colleague has said that the United States, the Bureau of Prisons, doesn't have any authority with regard to Mr. Bloomgarden, who's presently in California custody. Well, their own brief says he's on loan to California. Well, if he's on loan, that loan can be called. And the Bureau of Prisons can say, look, he's really in Bureau of Prisons custody, and therefore we have to take him back so that the right under the Detainer Act is enforced. And I put to this court the fact that if under these egregious circumstances, which this record shows, which shows that notwithstanding three notices written by Mr. Bloomgarden, notwithstanding the fact that he went to a federal district court, the Bureau of Prisons, following those four major actions, handed him over to California and essentially said to him, you have no rights. If this court permits that, there's no deterrent, really, to the Bureau of Prisons for saying the IAD is worthless. We will never enforce it because there's no enforcement that can ever be applied. To have meaningful, I mean, you know, when there's a Fourth Amendment violation, Justice Cardozo famously said, because the constable has blundered, the prisoner should go free. This is not a blunder. What this record shows was a deliberate disregard of the IAD with the Bureau of Prisons saying, you're going to California, like it or not, we don't care what the provisions are. And Mr. Bloomgarden is saying, what about my rights under the IAD? What's going on here? And they simply ignored it totally. And we submit that this Court should take action to make sure that that does not happen again and that it does not affect even Mr. Bloomgarden, his life, whether he gets executed or not, and other prisoners who are subject to the IAD. Thank you. Thank you. Thank you, Counsel. We do appreciate the argument. It's an interesting case, and it's submitted. Thank you. And that will bring us to the last case on today's calendar, and that's the In-Ray Bluetooth Headset litigation, or Jones v. G.N. Netcom.
judges: Zouhary, Hawkins, Fisher